# United States Court of Appeals
## For the First Circuit

No. 12-1049

UNITED STATES OF AMERICA,

Appellee,

v.

EVGUENI TETIOUKHINE,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

J. Martin Richey for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

July 26, 2013

_____

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LIPEZ, Circuit Judge**. This appeal links the stories of defendant Evgueni Tetioukhine, a native of Russia, and Fionghal Solomon MacEoghan, the man whose name, identifying information, and life history Tetioukhine assumed for over twenty years. Once Tetioukhine's appropriation of MacEoghan's identity was eventually discovered by law enforcement officials, he was charged in a nine-count indictment with, inter alia, wire fraud, providing false information to obtain federal financial aid, making false statements in an application for a U.S. passport, and aggravated identity theft.

At trial, Tetioukhine claimed that he lacked the requisite intent to be guilty of misappropriating MacEoghan's identity. Although the defense itself was not unique, his story was. Tetioukhine testified to his belief that he had been lawfully adopted by MacEoghan's biological father, Laurence Albert McCoon. As a result, Tetioukhine said, he genuinely thought he had taken on MacEoghan's identity through legitimate means and had the right to use MacEoghan's identifying information as his own.

The jury rejected this defense and found Tetioukhine guilty. On appeal, he challenges two of the district court's evidentiary rulings: first, the exclusion of a proposed expert witness in Soviet adoption practices and cultural differences between the former Soviet Union and the United States, and second,

the admission of evidence pertaining to his 1996 larceny conviction.  Discerning no error, we affirm.

I.

## A.  Fionghal Solomon MacEoghan and Evgueni Tetioukhine

We briefly summarize the following facts, drawn from the trial testimony and documentary evidence.  In 1969, Fionghal MacEoghan was born in Dublin, Ireland, to Laurence Albert McCoon,[1] a U.S. citizen, and Rosamond Decoursey Ireland.  Although MacEoghan lived in Ireland for most of his life, he claimed U.S. citizenship through his father.

McCoon lived with his wife and son for a time, but then left the family when MacEoghan was about three or four years old.  McCoon later returned to Ireland and reunited with the family when MacEoghan was about ten or eleven, and all three of them moved to the United States together.  MacEoghan and his parents lived in Englewood, California, and also spent time in Minnesota.  At some point during MacEoghan's childhood, McCoon applied for and obtained a U.S. Social Security card on his behalf.

McCoon and Decoursey Ireland eventually separated, and mother and son returned to Ireland.  McCoon had only limited contact with them for the remainder of MacEoghan's childhood.  The last time MacEoghan had seen his father was circa 1983.  MacEoghan

---

[1]  McCoon changed the spelling of his last name to "MacEoghan" at some point, and also went by the name "Albert Finley MacEoghan." We refer to him as McCoon for simplicity's sake.

had never met Tetioukhine, or visited Rhode Island until he arrived there to testify at the trial.

One night, to amuse himself during a boring evening, MacEoghan entered his last name into Facebook's search engine, which returned the profile of a person named Olesya MacEoghan. This name caught MacEoghan's attention because the spelling of his surname was unusual, and he wondered if Olesya was a half sister or distant relative. MacEoghan contacted her via Facebook, and discovered that she lived in Rhode Island and was married to a man who also called himself Fionghal Solomon MacEoghan. This revelation initiated a chain of events that eventually uncovered the following facts.

In 1971, Tetioukhine was born in the former Soviet Union, in an area that is now part of Russia. Tetioukhine arrived in the United States in June 1991 on a temporary visa, which permitted him to stay in the country until October of that same year. Tetioukhine, however, did not leave the country on his appointed date. Instead, on October 31, 1991, the day after his deadline for departing the United States, he obtained a Rhode Island identification card in the name of Fionghal S. MacEoghan, after presenting a birth certificate and Social Security card with MacEoghan's identifying details. Tetioukhine then used the name to procure a replacement Social Security card, stating on the application that he was born in Ireland, that he was a U.S. citizen

by birth, and that McCoon was his father. On an application for a U.S. passport filed in 1993, Tetioukhine once again used MacEoghan's identifying information, and further stated that as a child, he had once possessed a U.S. passport that he had since "misplaced." Tetioukhine also used the identity to obtain a $260,000 mortgage loan and a Rhode Island driver's license.

In January 2009, Tetioukhine applied for a federal student loan of about $15,000, in order to attend a Rhode Island university. The school asked Tetioukhine to explain why he had not registered with the Selective Service, which for certain individuals was a prerequisite to receiving federal financial aid. Tetioukhine responded that while he was a U.S. citizen by birth, he had been born in Ireland and lived in Ireland and the United Kingdom for most of his life. He also stated that he had only arrived in the United States in March 1999.

In his defense at trial, Tetioukhine explained that not long after arriving in the United States, he met and befriended McCoon while they were both staying at a Chabad house (a Jewish community center) in Rhode Island. After learning of Tetioukhine's interest in staying in the country, McCoon offered to adopt him. As part of that process, McCoon brought him a Social Security card bearing MacEoghan's name. Although the parties now agree that McCoon never actually adopted Tetioukhine, the latter trusted that this purported adoption was legitimate. He also testified that in

the Soviet Union, adoptees regularly changed their names, birth dates, and other identifiers as part of the adoption process.  He thus believed that he had the right to take on MacEoghan's identifying information as his own.

**B.  Tetioukhine's Expert Testimony Proffer**

Before trial, Tetioukhine informed the government that he intended to call an expert witness, Sergei Khrushchev, in his defense.  Khrushchev is the son of former Soviet Premier Nikita Khrushchev.  At the time of trial, the younger Khrushchev was a senior fellow at the Watson Institute for International Studies at Brown University in Providence, Rhode Island.

Tetioukhine provided the government with initial information regarding Khrushchev via a letter dated July 20, 2011.  This missive stated that Khrushchev would testify "about the cultural and political experience of Soviet citizens in 1991 as well as the experience of Russian Jews in the Soviet Union as well as in the United States at the time of Mr. Tetioukhine's arrival."  Khrushchev's attached curriculum vitae addressed his knowledge of "Russian economic and political reforms" and "US-Soviet relations."  In early August 2011, Tetioukhine supplemented this disclosure with a brief two-page letter that identified three broad subjects of Khrushchev's proposed testimony: (1) adoption practices in the Soviet Union; (2) "the experience of a Russian Jewish immigrant to Rhode Island in the 1990s"; and (3) "late Soviet era American

propaganda," which would show that "Russians believed that coming to the United States was a very simple process and that centralized government and bureaucracy was extremely limited."

The government sought to preclude Khrushchev's testimony. The district court held a hearing on August 4, 2011, where it asked Tetioukhine to make an oral offer of proof regarding the specific testimony he intended to elicit from Khrushchev. Defense counsel noted that Khrushchev was present at the hearing and offered to have him testify, but the trial judge reiterated that counsel should make an oral proffer.

The proffer that followed focused heavily on Khrushchev's expertise in "the differences between Soviet and Russian culture and the culture of the United States," and how these differences might "impact[ the] decision making" of "leaders and of individuals." Counsel also discussed, inter alia, Khrushchev's knowledge of propaganda that had circulated in the Soviet Union, which portrayed the United States "as a society with little or no bureaucracy" and "a very free country where foreigners were welcome." Tetioukhine's counsel suggested that this perception would buttress the legitimacy of Tetioukhine's subjective belief in his adoption.

At the hearing's conclusion, the court excluded Khrushchev's testimony on the basis that it lacked relevance, would

not be helpful to the jury, and would "confuse and [] obfuscate the real issues."

## C.  The Trial and Tetioukhine's Impeachment

For its part, the government informed the court and defense counsel before trial that if Tetioukhine took the stand on his own behalf, the government would impeach his testimony with his 1996 conviction for larceny in a building.  See Mass. Gen. Laws ch. 266, § 20.  The conviction arose from Tetioukhine's theft of multiple pieces of gold over several months from his then-employer, a jewelry company.  Prior to trial, defendant moved to exclude this testimony.  The court deferred ruling on this motion until trial.

At trial, Tetioukhine took the stand in his own defense. He portrayed himself as a dutiful, gainfully employed person whose assumption of MacEoghan's identity was consistent with his desire to follow the law.  When the subject of Tetioukhine's prior employment at the jewelry company arose, he stated that he had worked there for four or five months, and that he had left that job and eventually found another position.  He did not mention the reason for his departure from the jewelry company.  Tetioukhine also testified regarding other jobs he had held during his years in the country.

After this testimony, the government argued Tetioukhine had opened the door to admitting his prior conviction by leaving "the inference that he is a law-abiding citizen with a solid

employment history" who "follow[ed] the law and pa[id] his taxes." Although the court did not agree that the door had been opened to the conviction itself, it permitted a limited line of questioning regarding the circumstances of Tetioukhine's departure from his former employer.

When the government resumed questioning and asked Tetioukhine about the incident, he testified that he had only stolen "a tiny piece of gold." The government challenged this assertion, and Tetioukhine responded by minimizing the seriousness of his thefts. For example, Tetioukhine testified that "[t]his never went to court. . . . They promised me to basically drop the case or something like that, and that was the story." The court ruled that Tetioukhine had now made the conviction itself admissible. The government then asked Tetioukhine whether he had pleaded guilty to larceny in 1996, and defendant admitted that he had.

At the trial's conclusion, Tetioukhine was found guilty of eight counts of the indictment, one of the aggravated identity theft counts having been dismissed before trial on the government's motion. After the jury rendered its verdict, the court later dismissed another of the aggravated identity theft counts. The court then sentenced Tetiouhkine to 48 months in prison. Tetiouhkine filed a timely appeal of the judgment of guilt on the remaining seven counts.

We review the district court's evidentiary rulings for abuse of discretion.  See United States v. Chiaradio, 684 F.3d 265, 277 (1st Cir. 2012); United States v. Landry, 631 F.3d 597, 604 (1st Cir. 2011).  We do not substitute our views for those of the district court.  Instead, we defer to the trial judge's sound judgment, vacating only when "a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales."  United States v. Nguyen, 542 F.3d 275, 281 (1st Cir. 2008) (quoting United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992)) (internal quotation marks omitted).

## A.  The Exclusion of Khrushchev's Testimony

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  This evidence, even if it passes the requirements of Rule 702, remains subject to Rule 403's balancing test.  See United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011); see also Fed. R. Evid. 403 (permitting court to exclude

relevant testimony if probative value is "substantially outweighed" by danger of, inter alia, unfair prejudice, confusion, or misleading jury).

The proponent of the evidence bears the burden of demonstrating its admissibility. See Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 30 (1st Cir. 1992). Accordingly, the proponent must explain to the trial judge why the expert's testimony meets the requirements of Rule 702, so that the court can make an appropriate assessment of its admissibility. See United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1991) (holding that "a defendant who seeks the admission of expert testimony must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the [issues in dispute]").

Tetioukhine's sole defense was that he lacked the requisite intent to be guilty of misappropriating MacEoghan's identity. To advance this defense, he testified to his belief that McCoon had legally adopted him and that he was unaware of the true Fionghal MacEoghan's existence. Under these circumstances, he genuinely believed that the purported adoption lawfully permitted him to take on a name, birth date, and background different from those related to his own birth, and that he was therefore telling the truth as he knew it when he represented himself as MacEoghan to the world.

-11-

Recognizing that this theory might seem implausible to a jury, Tetioukhine argued to the court that Khrushchev's "cultural context" testimony would have shown that his beliefs were "subjectively reasonable." We take this assertion to mean that a reasonable person who shared his nationality and cultural background would have also shared his view of his adoption.[2] Accepting, for the purposes of evaluating his evidentiary claim, that Tetioukhine's subjectively reasonable beliefs would have been probative of his lack of the requisite intent, we note that defendant's initial written disclosures did little to elucidate the link between Tetioukhine's defense and Khrushchev's subjects of expertise. The supplemental letter sent in August 2011 contained more specifics regarding Khrushchev's proposed testimony. Once again, however, its broad statements regarding American propaganda in the former Soviet Union and "the experience of a Russian Jewish immigrant to Rhode Island" bore only a slender connection to the key disputes in the case.

Of course, the relevance of expert testimony regarding cultural matters is context-dependent and must be assessed on a case-by-case basis. The one grain of relevance we perceive in

---

[2] Tetioukhine does not fully explain how the "subjective reasonableness" of his beliefs fits into his defense. Whatever labels he affixes to his theory of the case, however, we take his core contention to be that he believed he was acting lawfully when he used MacEoghan's identifying information as his own. As the parties do not dispute that such a belief would serve as a defense to all charges, we accept the proposition for present purposes.

Khrushchev's proposed testimony concerned Russian adoption law, custom, and practice. Testimony about this subject might have buttressed Tetioukhine's purported belief that, once adopted by McCoon, he could lawfully use MacEoghan's identifying information as his own.

Given the vagueness of defendant's pretrial disclosures, Tetioukhine's oral proffer afforded him a critical opportunity to focus on this aspect of Khrushchev's proposed testimony. Instead, the oral proffer was larded with the same general references to cultural differences described in the written disclosures. Counsel's attempts to explain the significance of American propaganda available to people in the Soviet Union, and the supposed perception of the friendly and welcoming nature of American society, often devolved into unhelpful abstractions that failed to build the crucial bridge to the issue of Tetioukhine's intent.

The following exchange was emblematic of the proffer's murkiness:

> MS. MCELROY: Your Honor, [Khrushchev] can also testify about the expectations that he had as an individual, but also the differences --
> THE COURT: That who had?
> MS. MCELROY: That Professor Khrushchev had, the differences between the culture that he experienced in the Soviet Union and the culture that he experienced when he came here and his education in both of those cultures both before and since his emigration to the

-13-

> United States and how those cultures work differently.
>
> THE COURT: Specifically?
>
> MS. MCELROY: Specifically that some of the propaganda . . . was that America was a society with little or no bureaucracy; that America was a free country where foreigners were welcome at all -- you know, always welcome; . . . that particularly Jews were welcome in the United States.

As the district court correctly noted, "Russian culture is a very broad topic" with little evident probative value, and counsel's statements regarding the different workings of the two cultures and the Soviet perception that America "was a free country" did little to establish the relevance and helpfulness of Khrushchev's testimony. Thus, based on the information presented, the district court was within its discretion to conclude that Khrushchev's proposed testimony was largely irrelevant and unhelpful. Cf. United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001) (concluding that trial judge did not abuse discretion in excluding testimony regarding "cultural tribal traits and customs" due to its "tenuous" connection to issues in case).

Despite defense counsel's unfocused exposition of Khrushchev's proposed testimony, the district court did address the relevance of expert testimony concerning Russian adoption practices. The court ultimately characterized that testimony as irrelevant because Khrushchev would speak to child adoption practices, whereas Tetioukhine was adopted as an adult. To the extent that Khrushchev had any relevant testimony to offer on the

subject of adoption, however, we discern an independent basis for excluding it.  See Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 n.4 (1st Cir. 2012) (affirming exclusion of expert testimony on basis other than district court's rationale); see also United States v. Wintermute, 443 F.3d 993, 1000 (8th Cir. 2006) (stating that appellate court may affirm district court's decision to admit expert testimony "on any ground supported by the record, even if that ground was not a basis for the district court's ruling").  Specifically, there was little, if anything, in Khrushchev's background that would qualify him to offer opinions about adoption practices at all.  See Fed. R. Evid. 702(a) (requiring expert to have "scientific, technical, or other specialized knowledge").  His stated areas of competence and his publication record focus heavily on world affairs and national security issues, rather than family law and adoption customs in the former Soviet Union.  Indeed, his avowed knowledge in the latter area was "purely anecdotal," United States v. Giambro, 544 F.3d 26, 33 (1st Cir. 2008) (internal quotation marks omitted), the simple result of having lived in the former Soviet Union.  Tetioukhine himself was equally capable of testifying to these matters, as he did.  There was no basis for according Khrushchev the imprimatur of an "expert" in an area where he lacked specialized knowledge.

For these reasons, we see no basis for overturning the district court's exclusion of Khrushchev's testimony.[3]

## B.  The Admission of Tetioukhine's 1996 Conviction

A party may introduce evidence to impeach a witness's specific testimony by contradiction.  See United States v. Norton, 26 F.3d 240, 244 (1st Cir. 1994).  Where this evidence is used to "contradict material false testimony injected into the trial by [the defendant] himself," "the general strictures" of Federal Rules of Evidence 402 and 403 govern.  Id.; see also Fed. R. Evid. 402 (stating that relevant evidence is admissible unless U.S. Constitution, federal statute, or rules say otherwise); id. 403 (allowing exclusion of relevant testimony if "its probative value is substantially outweighed" by danger of, inter alia, unfair prejudice).  The defendant may open the door to such evidence even if it is otherwise inadmissible.  See Landry, 631 F.3d at 605.

This principle applies to the admission of prior convictions.  Federal Rule of Evidence 609 sets the limits on the admissibility of a conviction to impeach a witness's overall character for truthfulness, particularly if, as here, the

_____

[3] Khrushchev was present during the proffer and defense counsel offered to let the court voir dire him in order to clarify any uncertainty regarding the specific subjects of his testimony. Tetioukhine does not argue, however, that the court abused its discretion in relying only on his oral proffer.  Moreover, "[t]he trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow."  United States v. Vargas, 471 F.3d 255, 261 (1st Cir. 2006).

conviction was obtained or the defendant was released from incarceration over ten years ago. See Fed. R. Evid. 609(b)(1) (allowing admission of conviction ten years or older only if "its probative value . . . substantially outweighs its prejudicial effect"). Nevertheless, Rule 609 "does not address the admissibility of prior convictions when they are offered for another purpose," such as contradicting specific testimony. Norton, 26 F.3d at 243. Thus, "a defendant can . . . open the door to evidence about prior convictions" under Rules 402 and 403, Landry, 631 F.3d at 605, regardless of whether the conviction meets Rule 609's requirements, see United States v. Gilmore, 553 F.3d 266, 272 (3d Cir. 2009) ("[P]rior felony convictions more than ten years old may be used to impeach by contradiction even if they do not satisfy Rule 609's balancing and notice conditions.").[4]

Here, we address two separate door openings. The district court concluded that the first door opened after Tetioukhine portrayed himself as a law-abiding person with a solid work history. The court permitted a limited line of questioning regarding the facts of Tetioukhine's termination from the jewelry company, but did not admit the conviction itself. The second door

---

[4] The balancing tests of Rules 403 and 609 differ. Under Rule 609(b), the probative value of the prior conviction must "substantially outweigh[] its prejudicial effect" to justify admission. Fed. R. Evid. 609(b)(1). Rule 403, by contrast, permits the court to exclude evidence if its "probative value is substantially outweighed" by the danger of, inter alia, unfair prejudice, confusing the issues, or misleading the jury. Id. 403.

opened when the government inquired about the circumstances of his departure, and Tetioukhine downplayed the nature of his conduct. The court then deemed the conviction itself admissible as well.

The main issue in dispute is whether the district court correctly concluded that Tetioukhine opened that first door when it stated that "[Tetioukhine] said that he wanted to follow the law." Defendant argues that this ruling was based on a flawed recollection of the testimony. We disagree. Tetioukhine testified that he obtained a position at the jewelry company, where he worked for "roughly about four or five months." His counsel then asked whether he "at some point [got] a different job," to which Tetioukhine replied "Yes." He then spoke about obtaining a position with an inventory supply company, which later closed, requiring him to find work with a different inventory company. He also testified regarding the paperwork he submitted to verify his eligibility to work in the United States, which, among other things, was necessary to withhold taxes from his paychecks.

Tetioukhine is correct that he never stated expressly that he left his position with the jewelry company for innocuous reasons. We also do not adopt the government's view that his testimony about his attempts "to follow rules relating to employment[ and] immigration" was sufficient to open the door to his conviction, given that this evidence was merely consistent with his overall defense that he had lawfully adopted MacEoghan's

-18-

identity.  Nevertheless, Tetioukhine invited questioning about the circumstances of his departure from the jewelry company when he introduced specific testimony about his employment for the apparent purpose of enhancing his self-portrayal as a law-abiding citizen. His statements left the jury with the impression that he had an unproblematic work history, and that he had quit his job with the jewelry company simply to find another position.  The omission of facts that did not fit into this narrative thus "created a false impression that made the circumstances of [his] termination relevant."  Landry, 631 F.3d at 605.  The opening may have been slight, but we cannot say that the court abused its discretion in permitting a limited line of questioning regarding the reason he left the jewelry company.  See United States v. Balthazard, 360 F.3d 309, 317 (1st Cir. 2004) ("By seeking to create an impression in the minds of jurors that Balthazard had had only limited prior contacts with law enforcement, Balthazard's counsel opened the door to questioning about additional reports that linked Balthazard to other criminal activity."); see also United States v. LeAmous, 754 F.2d 795, 798 (8th Cir. 1985) ("By painting a picture of himself . . . as a protector of young girls who encouraged alternatives to prostitution, the defendant invited cross-examination concerning particular instances of his conduct to the contrary during the relevant time frame.").

Tetioukhine then opened the second door largely unprompted. The government asked Tetioukhine whether the jewelry company had fired him. He acknowledged that it had, but attempted to reduce the seriousness of his misdeeds:

> Q:  You were fired for taking things from your employer, correct?
> A:  That's correct.
> Q:  Gold; correct?
> A:  Yes.  It was a tiny piece of gold, yes.

When the truth of this last assertion was challenged, Tetioukhine responded that he "wasn't arrested" for his misconduct, the matter "never went to [] court," that he "just talk[ed] to policemen," and "they promised [] to basically drop the case." All of these statements were patently false. Indeed, most of these statements were volunteered, rather than directly elicited by the prosecutor's questions. Tetioukhine's repeated "attempt[s] to minimize the conduct for which he was convicted," United States v. Baylor, 97 F.3d 542, 545 (D.C. Cir. 1996), were more than sufficient to open the door to further cross-examination on this subject.

On appeal, Tetioukhine unpersuasively maintains that the government's line of questioning should have ceased immediately after he admitted that he had been terminated for "taking things from [his] employer." After that acknowledgment, the government asked only a brief clarifying question that inquired whether Tetioukhine had stolen gold. Tetioukhine then began digging himself into a hole by stating that he had stolen only "a tiny

-20-

piece of gold," leading to the succession of untruths that opened the door fully to the admission of his larceny conviction.

## III.

There was no abuse of discretion in the district court's evidentiary rulings. Tetioukhine's convictions are therefore <u>affirmed</u>.

**<u>So ordered.</u>**