# United States Court of Appeals
## For the First Circuit

No. 14-1764

UNITED STATES OF AMERICA,

Appellee,

v.

GERALD J. SILVA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, Chief U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

    Robert B. Mann, with whom Mann and Mitchell was on brief, for appellant.
    Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

July 20, 2015

**BARRON**, **Circuit Judge**.  Gerald Silva raises a number of challenges to his convictions for receipt and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (4).  Silva first contends that the child pornography statutes under which he was charged were unconstitutionally vague.  He then argues that the District Court should have dismissed one count of the indictment for which, he contends, there was no evidence submitted to the grand jury.  He also argues that the District Court abused its discretion in barring the testimony of Silva's proposed expert witness and in instructing the jury.  And finally, Silva argues that the District Court wrongly denied his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  We find no merit to any of these challenges and therefore affirm the conviction.

## I.

According to evidence offered at trial, this case arises from an investigation by Canadian police who, in cooperation with law enforcement in the United States, were investigating a company, Azov Films, due to its alleged production and distribution of materials featuring nude, young boys.  Azov operated a website that offered a variety of materials, including some films produced by other companies and some Azov-produced films.  A United States postal inspector testified at trial that there had been citizen

complaints "in which people stated that they were selling child pornography on the website."

On May 1, 2011, Canadian authorities executed a search warrant on Azov's Toronto premises and shut down the website. Canadian law enforcement seized business records -- including customer purchase and shipping information -- and passed the records along to the United States Postal Inspection Service. The records listed Gerald Silva as a customer and showed that he placed twenty-two orders between October 2010 and April 2011 and bought seventy-five items, eleven of which are listed in the indictment.

Silva was charged with six counts of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and with one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4). Silva was found guilty on all counts after a jury trial in the District of Rhode Island. He was sentenced to a 72-month term of imprisonment. He now appeals.

## II.

We begin with Silva's challenge to the constitutionality of the statute. The statutory provisions under which Silva was charged both define child pornography as "any visual depiction . . . if -- (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of such conduct." 18 U.S.C. § 2252(a)(2); see also id. § 2252(a)(4). The statute cross-

referenced by these measures defines "sexually explicit conduct" to include the "lascivious exhibition of the genitals or pubic area of any person." Id. § 2256(2)(A)(v).[1]

Silva contends that "lascivious exhibition" is too vague to provide notice of what depictions fall within the definition of child pornography and to provide standards for law enforcement to prevent the arbitrary enforcement of the statute. He therefore contends that his convictions under the statutes violate his Fifth Amendment due process rights, a challenge we review de novo. United States v. Zhen Zhou Wu, 711 F.3d 1, 11-12 (1st Cir. 2013).

The Supreme Court in United States v. X-Citement Video, Inc., 513 U.S. 64 (1994), however, rejected a constitutional vagueness challenge to the same definitional provision of the statute. The Court described the vagueness claim raised by the defendants as "insubstantial," and adopted the reasoning of the Ninth Circuit. Id. at 78-79. The Court of Appeals had found that "'[l]ascivious' [was] no different in its meaning than 'lewd,' a commonsensical term whose constitutionality [had been] specifically upheld in" the Supreme Court's prior precedents.

_____

[1] The full text of the definition in 18 U.S.C. § 2256(2)(A) provides:

> "[S]exually explicit conduct" means actual or simulated -- (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person; . . . .

- 4 -

United States v. X-Citement Video, Inc., 982 F.2d 1285, 1288 (9th Cir. 1992) (citing Miller v. California, 413 U.S. 15 (1973), and New York v. Ferber, 458 U.S. 747 (1982)); see also United States v. Frabizio, 459 F.3d 80, 85 (1st Cir. 2006) ("The courts are also in agreement that the term 'lascivious' is sufficiently well defined to provide . . . notice of what is permissible and what is impermissible."). Silva's constitutional due process challenge is thus without merit.

### III.

Silva next challenges the District Court's denial of his motion to dismiss count seven of the indictment, which charged Silva with knowing possession of child pornography under 18 U.S.C. § 2252(a)(4). Silva contends the grand jury heard no evidence to support count seven and thus that the District Court erred in denying his pretrial motion to dismiss it. But see Kaley v. United States, 134 S. Ct. 1090, 1098 (2014) ("The grand jury gets to say -- without any review, oversight, or second-guessing -- whether probable cause exists to think that a person committed a crime."); Costello v. United States, 350 U.S. 359, 363-64 (1956). But the grand jury clearly heard evidence to support count seven as it was written in the indictment and thus the argument Silva makes is without foundation.[2]

---

[2] Count seven of the indictment stated:

- 5 -

That is so even though Silva contends that there was no evidence to support count seven as it was framed in a subsequently furnished bill of particulars. That bill of particulars, which the government provided Silva in response to his motion requesting that it do so, did identify three specific films that would be used as evidence for count seven at trial, while the count set forth in the indictment itself was not limited to any particular films. But the bill of particulars is not the indictment, and thus the specificity of the bill of particulars does not change the fact that the government supplied the grand jury with evidence to support count seven of the indictment as it was stated. See Roberts v. United States, 752 A.2d 583, 592 (D.C. 2000) ("Although the specific details of the carnal knowledge incident specified in the bill of particulars had not been individually presented to the grand jury, that body heard ample evidence of the entire series of events of which that incident was a part."). The District Court

        From in or about April 2010 to on or about September 27, 2012, in the District of Rhode Island and elsewhere, the defendant, GERALD J. SILVA, did knowingly possess one or more matters which contained a visual depiction of sexually explicit conduct, the production of which involved the use of a minor engaging in sexually explicit conduct, that had been transported in interstate and foreign commerce and which was produced using materials which had been transported in interstate and foreign commerce. All in violation of 18 U.S.C. §2252(a)(4).

therefore properly rejected Silva's challenge to the sufficiency of the evidence before the grand jury. See United States v. Capozzi, 486 F.3d 711, 727 (1st Cir. 2007).

## IV.

Silva also argues that the District Court erred in preventing the testimony of the defendant's proposed expert witness. We review this ruling for abuse of discretion. United States v. Tetioukhine, 725 F.3d 1, 6 (1st Cir. 2013).

Silva offered Professor John Leo, a retired Professor of English from the University of Rhode Island, as an expert under Federal Rule of Evidence 702. The District Court conducted an evidentiary hearing on the matter, at which Professor Leo testified. The District Court then declined to permit Professor Leo to appear as an expert witness.

Silva argues that the District Court erred in excluding Professor Leo's testimony because Silva asserts it "would have helped the jury understand the pictures" because Professor Leo's "technical understanding of film" would have "enhance[d] the [jury's] understanding of the videos in question in this case." In particular, Silva contends that Professor Leo was expected to testify to his opinion that the settings for the films were generally not sexually suggestive, and that the poses and conduct of the children were not suggestive.

The District Court has discretion, however, to evaluate whether an expert witness will provide helpful testimony in this context. See Frabizio, 459 F.3d at 85 & n.8 ("[W]hether a given depiction is lascivious is a question of fact for the jury" and "expert testimony is not required on the subject."); United States v. Arvin, 900 F.2d 1385, 1390 (9th Cir. 1990) ("Because the jury was fully capable of making its own determination on the issue of 'lasciviousness,' the district court did not abuse its discretion in excluding the expert testimony."); cf. Hamling v. United States, 418 U.S. 87, 100 (1974) ("Expert testimony is not necessary to enable the jury to judge the obscenity of material which, as here, has been placed into evidence."). And here we see no error in the District Court's reasonable assessment and exclusion of the proposed expert testimony. See Arvin, 900 F.2d at 1390.

The District Court evaluated the testimony that Professor Leo expected to offer and considered "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading of the jury, or unnecessary delay." United States v. Rodríguez-Berríos, 573 F.3d 55, 71 (1st Cir. 2009). The District Court then supportably found that Professor Leo did not purport to "know any of the purposes or reasons why a purchaser would purchase these videos," that he "did not express any expertise that would allow him to help the jury on the why or

the intent of the producer," and that he did not "appear to have any opinions about" European film, nudity, or nudism.  And as to the points that Silva expected Professor Leo to make in his trial testimony, the District Court reasonably concluded that the jurors could reach their own conclusions about the contents of the films from their own viewing.  See United States v. Mehanna, 735 F.3d 32, 67 (1st Cir. 2013) ("It is common ground that a trial court may bar expert testimony if that testimony will not assist the jury to sort out contested issues.").

Nor did the District Court err in preventing Professor Leo from testifying as a summary witness under Federal Rule of Evidence 1006, which permits summaries "to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  See United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004) (applying Fed. R. Evid. 1006 to a summary witness).  Here, too, we review for an abuse of discretion. See Tetioukhine, 725 F.3d at 6.  The record supports the District Court's conclusion that Professor Leo -- in his testimony at the evidentiary hearing conducted to determine whether he could testify -- "was rambling and unfocused, talking about one video and another video, and he was all over the place."  The District Court was thus well within its discretion in rejecting a proposed summary witness who had demonstrated his inability to provide the

concise review of the evidence that the rule is written to allow to aid the jury.

**V.**

Silva next argues that the district court erred in instructing the jury. Silva objects to two instructions on the ground that each was unfairly prejudicial, a challenge we review for abuse of discretion. United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012).

First Silva objects to the District Court's instruction that "[i]f the Defendant incorrectly believed what does and does not constitute child pornography, that does not relieve him of responsibility as long as the Government has proven the elements that I've outlined above." Silva argues that the instruction was prejudicial because he contends that the instruction functioned as a "comment on the testimony of the defendant" and that "the effect of the contested instruction was to inappropriately focus on the defendant's belief, when the real issue was whether the government had proved the defendant's knowledge."[3]

---

[3] To the extent Silva argues that the instruction improperly "diminishe[d] the Government's burden with respect to proving knowledge," he is wrong. In order to prove the "knowing" element of the child pornography statutes, "[t]he defendant must believe that the picture contains certain material, and that material in fact (and not merely in his estimation) must meet the statutory definition." United States v. Williams, 553 U.S. 285, 301 (2008); United States v. Knox, 32 F.3d 733, 754 (3d Cir. 1992) ("[T]o fulfill the knowledge element of § 2252, a defendant simply must be aware of the general nature and character of the material and

We disagree. "When an instruction is pertinent to the issues submitted to the jury and constitutes an accurate statement of the law, it is hard to imagine any basis for a claim of error." United States v. Nascimento, 491 F.3d 25, 34 (1st Cir. 2007). And here, the District Court delivered the instruction to clarify what the government had to prove about the defendant's knowledge in the face of Silva's assertions in testimony that the materials were not child pornography. See id. ("We see no realistic possibility that [the instruction] [was] a source of juror confusion. Consequently, the district court did not abuse its discretion in charging the jury as it did.").

Silva also objects to the District Court's instruction that the jury should consider "whether the witness had anything to gain or lose from the outcome of this case. In other words, was the witness totally impartial, or did the witness have some stake in the outcome or some reason to favor one side or the other." Silva contends that this instruction must have been referring to him, even though it was phrased in general terms, because he was the only person with an interest in the case. He thus argues the instruction functioned as an impermissible comment on his credibility. See United States v. Dwyer, 843 F.2d 60, 63 (1st

---

need not know that the portrayals are illegal."). The challenged instruction correctly articulated this principle.

- 11 -

Cir. 1988) ("A charge containing denigrating implications should not be given unless it serves some useful purpose or need.").

Silva does not explain, however, how the District Court's instruction to consider witness credibility generally -- phrased neutrally and without reference to the defendant -- could be taken as a comment as to his lack of credibility. Instead, as the government notes, law enforcement agents also might have an interest in the successful outcome of a case they have investigated. The instruction thus simply served to remind the jury of its responsibility to evaluate and assess witness credibility, see United States v. Maguire, 918 F.2d 254, 269 (1st Cir. 1990) (approving instructions in which the district court "repeatedly emphasized that the final resolution of the issues rested with the jury and that it had the sole responsibility for determining the credibility of the witnesses and finding the facts"), and so the District Court did not abuse its discretion by issuing it.

## VI.

Silva also argues that the District Court erred in denying his motion for a judgment of acquittal because there was insufficient evidence to support the convictions. We review this preserved challenge de novo, viewing the evidence in the light most favorable to the government to determine whether the evidence would allow a rational factfinder to conclude the defendant

committed the charged crime beyond a reasonable doubt.  United States v. Almeida, 748 F.3d 41, 52 (1st Cir. 2014).

Silva moved for a judgment of acquittal at the conclusion of the government's case, and renewed his motion at the conclusion of all the evidence.  He presented two arguments.  As to all counts he argued that the government did not prove that the images were child pornography.  As to the first six counts, for receipt of child pornography under 18 U.S.C. § 2252(a)(2), he argued that the government did not prove that he "knowingly received" child pornography.  The District Court denied the motion.  Silva now challenges that ruling, and we consider each aspect of his challenge to the sufficiency of the evidence in turn.

**A.**

Silva argues first that while the question "whether a given depiction is lascivious is a question of fact for the jury," Frabizio, 459 F.3d at 85, the government failed to provide enough evidence to prove beyond a reasonable doubt that the materials covered by the seven counts depicted the "lascivious exhibition of genitals" as defined in 18 U.S.C. § 2256.  Silva argues that the "depictions take place in a variety of settings," and that "mostly, the boys are playing."  Though Silva acknowledges that the depictions are of boys who are "unquestionably nude," he suggests that "the films might be better viewed as a paean to naturalism and nudism."  Silva thus argues that there was insufficient

- 13 -

evidence to show that the depictions met the standard of lasciviousness.

The problem for Silva is that, even though he contends that the films "might be better viewed as a paean to naturalism and nudism," a rational juror could reach a different conclusion based on the evidence presented at trial. See United States v. Wilder, 526 F.3d 1, 12 (1st Cir. 2008) ("The question for our determination on appellate review . . . is whether a reasonable jury could have reached the conclusion that the images were of sexually explicit conduct."). After all, the jury watched the footage of the films, and the jurors were entitled to evaluate and determine whether the films involved the "lascivious exhibition of genitals" based upon the images they saw. See Frabizio, 459 F.3d at 85 ("[W]hether the item to be judged is lewd, lascivious, or obscene is a determination that lay persons can and should make. . . . In making this determination, the standard to be applied by the jury is the statutory standard. The statutory standard needs no adornment." (internal quotation marks and citation omitted)).

We have previously explained that lascivious is a "commonsensical" term and that there is no exclusive list of factors -- such as the so-called Dost factors -- that must be met for an image (or a film) to be "lascivious." See Frabizio, 459 F.3d at 85 (citing United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986)); see also United States v. Amirault, 173 F.3d

- 14 -

28, 31-32 (1st Cir. 1999). Here, it is enough to note from our review that -- as the District Court also concluded -- the evidence reveals that the films showed young boys almost always depicted fully nude, with no evident storyline or discernible artistic explanation for the footage. Moreover, each film showed boys engaged in some activity or activities, which -- though varying from film to film -- displayed their genitalia in a manner that, as the District Court concluded, a jury reasonably could deem to be intended to sexually arouse the viewer. See Amirault, 173 F.3d at 31-32 (finding "whether the image is intended or designed to elicit a sexual response in the viewer" a relevant factor "in evaluating whether the display in question is lascivious" (citing Dost, 636 F.Supp. at 832)).

It is true that the films combined included approximately twenty three hours of footage, with certain images in which the boys' clothing or the activity temporarily obscured the view of the boys' genitalia. But each of the films also included scenes, for example, of the boys wrestling or showering in positions that gave the camera a clear shot of their genitalia, or lounging, standing, or sitting in postures that prominently displayed their genitalia in the camera shot. Considering the films as whole under count seven, and the images depicted in each of the films listed in the other counts, the jury's determination that the films depicted "sexually explicit conduct," in the form

of "lascivious exhibition of genitals" of children, was thus a rational conclusion drawn from the evidence.  See Wilder, 526 F.3d at 12.

### B.

Silva's second argument is that the government did not prove that he knowingly received child pornography as required by counts one through six.  See 18 U.S.C. § 2252(a)(2) (prescribing punishment for any person who "knowingly receives" depictions of minors engaged in sexually explicit conduct).  Unlike count seven, each of these counts identified a specific film, or set of films, that Silva had received.  For this charge, the government had to prove the material that Silva received as described in each count in fact met the statutory definition for child pornography and that Silva knew "the facts that ma[d]e his conduct fit the definition of the offense" at the time of receipt.  Elonis v. United States, 135 S. Ct. 2001, 2009 (2015) (quoting Staples v. United States, 511 U.S. 600, 608, n.3 (1994)); see also X-Citement Video, Inc., 513 U.S. at 78 ("[T]he term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers."); United States v. Gendron, 18 F.3d 955, 959 (1st Cir. 1994).

The government did not need to show, however, that the defendant knew the material was in fact illegal at the time of receipt.  See United States v. Knox, 32 F.3d 733, 754 (3d Cir.

- 16 -

1994) ("[T]o fulfill the knowledge element of § 2252, a defendant simply must be aware of the general nature and character of the material and need not know that the portrayals are illegal."). Instead "a defendant generally must 'know the facts that make his conduct fit the definition of the offense,' even if he does not know that those facts give rise to a crime." Elonis, 135 S. Ct. at 2009 (quoting Staples, 511 U.S. at 608 & n.3); see also United States v. Williams, 553 U.S. 285, 301 (2008) ("The defendant must believe that the picture contains certain material, and that material in fact (and not merely in his estimation) must meet the statutory definition."); Hamling, 418 U.S. at 123 ("To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law.").

In arguing that the government failed to provide sufficient evidence from which a jury rationally could find beyond a reasonable doubt that he knowingly received unlawful materials, Silva contends that, even if some of the materials he received were illegal child pornography, the Azov website also sold materials that did not contain child pornography. He thus argues that the government failed to show that when he placed his orders on the Azov website -- which he contends contained, at most, both legal and illegal materials -- he knew that he was going to receive materials that fell into the latter category.

But the government presented evidence about what Silva knew about the specific materials he ordered at the time that he placed those orders. And in consequence of that evidence, the jury could rationally conclude that Silva knew -- with respect to the specific films identified in each of these six counts -- that he was ordering and receiving films that did show nude children engaged in sexually explicit conduct.

We start with the evidence the government provided about what Silva would have encountered on the Azov website when he placed his orders. There was testimony that indicated a customer perusing the Azov Films' website would encounter a brief description of the material for sale. The jurors were then presented with the website pages for the films listed in the indictment.

In other words, the jury saw the actual pages from which Silva would have placed his order for each of the films listed in the indictment's six receipt counts. These pages included photos of the boys who were featured in each particular film, clothed or in swimsuits. The jury thus could conclude -- from viewing the descriptions and photos -- that Silva would know the boys were underage. Further, the website provided editorial content about each film. This content clearly communicated to its website

audience that each of the films Silva ordered would feature the boys nude.[4]

In addition, the website pages included descriptions that conveyed that these specific films would show the boys engaging in various types of activities but without offering any semblance of a plot or storyline. And the descriptions for each of the films went on to describe the activities in which the boys would be engaging using language that the jury clearly could have perceived as indicating the presence of sexually explicit content.[5]

---

[4] For the film in count one, FKK Waterlogged, the description listed the activities on "today's nudist menu." The film in count two, Vladik Remembered Vol. 1, was described to "compile a series of lengthy Vladik nudist scenes" in "this wonderful homage to the boy who helped establish Azov Films." The film in the third count, Vladik Remembered Vol. 2, is described as a "continued celebration in honor of Vladik's 18th birthday and official indoctrination into adulthood," -- showing "footage" of Vladick from when he was "between 14 and 16" -- in what was described as a "compilation of the best of the best Vladik naturist scenes" from "Crimea's most famous naturist." For the film in count four, Paul & Calin's Home Video, the website said that "the personalities of our on camera nudists, Calin and Paul, shine through" and the boys "get into some nudist fun." The film in count five, Cutting Room Floor: Vlaviu, carries a description of "Vlaviu and his buddies going commando in a very unique way" with "nudist food fighting." The film in count six, Raw Rewind Vol. 2, according to the website, consisted of "unedited naturist raw footage."

[5] The film in count one described "a cold shower" and "general horsing around . . . [which] gives way to some relaxing physical therapy in the form of a deep massage." The film in count two was a "compilation of scenes" of one featured boy and his "naturist buddies" in "sauna and beach antics." The film in count three described that the boys were featured "as they wreak havoc in some of Crimea's most exclusive saunas." The film in count four was described as including "probably one of the best wrestling matches (if not the best) we've ever filmed in the history of the Boy Fights line of nudist DVDs." The film in count five was promoted

- 19 -

So while Silva argues that "[t]he descriptions of the DVDs . . . did not provide notice that they contain child pornography," the descriptions clearly conveyed that the films offered seemingly no semblance of a story, with little dialogue or with foreign language dialogue left untranslated for viewers, and featured nude boys engaging in activities the jury could reasonably conclude he would have known to be sexually explicit. Thus, the website pages for the films that Silva ordered hardly require -- or even permit -- the benign characterization he contends must be given to them.

Relevant, too, is the fact that the website's film descriptions also identify particular boys as the stars of the productions and direct their "fans" to search among their other films.[6] In other words, the films did not advertise themselves as

as "discs of ooey-gooey slippery goodness." Some of Azov's film titles, like Raw Rewind Vol. 2 named in count six, also replicated the suggestive tone. See, e.g., United States v. Downsbrough, No. 3:13-CR-61, 2013 WL 5781570, at *13 (E.D. Tenn. Oct. 24, 2013) ("The names of some of the DVDs ordered by the Defendant from this same company [Azov] . . . [including] Raw Rewind Volumes 1-3 are sexually suggestive.").

[6] Specifically, the website's description for the film in count one said that "[i]f you're a fan of Paul, this is a must get" and "[s]ame with Calin fans." The Azov website described that the film in count two was created in "celebration" of "Azov Films' superstar, Vladik." The description for the film in count three addressed "Vladik fans" and described that "90% of the visitors to Azov Films are Vladik fans, and about half of those are die-hard Vladik fans." The description in the film from count four noted about one of a three-disc set that "this disc is not subtitled but will certainly be enjoyed, especially for fans of

"a paean to naturalism and nudism" as Silva suggested, but rather, as an exhibition of particular nude young boys.

Indeed, a United States postal inspector testified that "[t]hese videos have, and I hate to use the word but I can't think of a better one, their own stars and their own following" such that "the videos of particular boys [were] particularly sought by people who prefer that particular boy." And, by marketing the films as showcasing particular boys, the film descriptions indicated that, as to each film Silva ordered, the exhibition of those underage boys, who were also described as being nude and active in suggestive settings, was the point of the production. The jury thus could have found that this language about "fans" and the satisfaction they would derive from particular films -- given the rest of the descriptions -- would have alerted Silva, as a prospective purchaser, to the fact that these films were "intended or designed to elicit a sexual response in the viewer." Amirault, 173 F.3d at 31 (citing Dost, 636 F. Supp. at 832).

Finally, and further supporting the government's case, the jury received evidence of Silva's comments offering his own evaluation of the Azov website. Though made after the investigation was underway and he had already received the

---

Paul." The film from count five was described as "a must get for the true Vlaviu fan." The description for the film in count six told readers that "[y]ou'll recognize a young Igor, and Sasha."

- 21 -

materials, these comments -- when read in light of the evidence concerning the information conveyed by the website pages for the films he ordered -- provide a basis from which a jury could reasonably infer that Silva found the sexually explicit nature of the available materials evident from the face of the website. In other words, though Silva insists that a purchaser might have believed the materials to be benign at the time of ordering, the comments the jury heard about his own characterization of the website undercut the plausibility of such an assessment.

Specifically, the jury saw emails that Silva sent, soon after the website was shut down by Canadian authorities, to a professional acquaintance in the Rhode Island state police. These emails set forth Silva's own concerns with the Azov website. Silva wrote that the website "claim[s] to be a 'European Naturist' website" but noted that "the only naturist films that they have are of nude boys." He stated that "[t]hey sell mainstream films as well" but added that he suspected "that they do this to provide an 'air' of legitimacy." He wrote that he suspected that "the boys featured in their 'Naturist' films are being groomed to perform in the pornographic adult films when they come of age." Silva also explained that he feared Azov was "doing more with these boys than they are presenting" and that he had "a really bad feeling about what may be happening to those boys." And, underscoring the basis for inferring that Silva was himself

concerned about the website, Silva implicitly denied in his email to law enforcement that he had placed any orders with Azov, and he also wrote that he did "not intend to find out" about the website's "special offers."

Moreover, during a subsequent search of his house, according to the testimony of one law enforcement agent present at the search, Silva also "stated that he was concerned about a lot of things surrounding Azov Films.  One of his concerns was that he felt that the children may be being groomed for something later on in a sexual nature within this connotation.  He stated that he knew the children were being exploited."  And when told that the Azov website operators were likely in prison, the agent testified, Silva responded, "Good, they should be."

These comments thus provide a basis from which a rational jury could conclude that Silva understood the Azov website to be selling sexually explicit materials at the time he placed his orders, rather than that he would have been surprised by the content of the films that he eventually possessed.  And though Silva at trial and during the investigation offered an innocent explanation for his purchases -- namely, that he had purchased the films because he was working on a PowerPoint presentation related to his work with sex offenders at the probation office -- the jury was entitled to disbelieve what reasonably might have seemed like

a "dubious claim[] of innocence." <u>United States</u> v. <u>Hill</u>, 750 F.3d 982, 988 (8th Cir. 2014).

Given the cumulative force of these reasons, a rational jury could have concluded beyond a reasonable doubt that Silva had knowledge that the contents of the materials he ordered and received were of a kind that would bring such materials within the Act's coverage, whether or not Silva knew at that time that such contents rendered the films contraband as a legal matter. The District Court therefore did not err in denying Silva's motion for a judgment of acquittal.

## VII.

For the foregoing reasons, the judgment of the District Court is <u>affirmed</u>.